Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 

 HARRY T. EDWARDS, Circuit Judge:
 

 On April 15, 1983, appellant Florence Hicks foreclosed a mortgage on property held by a debtor who two weeks earlier had filed for bankruptcy. At a hearing before the bankruptcy court to determine whether this foreclosure violated the automatic stay of execution rule, the appellant and the Trustee of the bankrupt estate reached an oral settlement establishing procedures for
 
 *1078
 
 selling the property. On December 7, 1983, the bankruptcy judge signed an order, prepared by the Trustee, purporting to reduce the oral agreement to written form. Although the oral settlement apparently had included no such requirement, the written order provided that Hicks would not list the property for sale without first securing the Trustee’s prior
 
 written
 
 approval. This case comes to us on appeal from the District Court, which refused to set aside an order of the bankruptcy court finding Hicks in contempt for signing a listing agreement without the Trustee’s written approval. The contempt order required Hicks to authorize the Trustee to sell the property free and clear of all liens, and to reimburse the Trustee for his time “expended in the myriad of court hearings.”
 

 When oral argument was first heard on this appeal, it appeared to the court that this case raised difficult statutory and constitutional issues concerning the authority of a bankruptcy judge to hold a party in contempt. Supplemental briefing was ordered and a second hearing scheduled. At the request of the court, Professor Thomas G. Krattenmaker of the Georgetown University Law Center, serving
 
 pro bono pub-lico,
 
 and counsel from the United States Department of Justice appeared as amici. We especially wish to express our gratitude to Professor Krattenmaker for his extraordinarily able and illuminating written and oral presentations. His friend-of-the-court appearance was a resounding tribute to the best attributes of the American system of justice.
 

 We have carefully considered the constitutional issues raised in connection with this case, and have finally concluded that the matter can be resolved on a less historic note.
 
 [1]
 
 We have found that, even assuming,
 
 arguendo,
 
 that the bankruptcy court had statutory and constitutional authority to issue civil contempt citations at the time Hicks was held in contempt, the bankruptcy judge improperly exercised that power in this case. Civil contempt citations must either coerce compliance with a court order or compensate an injured party for losses caused by the violation of a court order. In this case, the sanctions served no remedial or compensatory purpose; instead, the sanctions served only to punish Hicks. With this resolution, we need not decide whether a bankruptcy judge has the authority to hold a party in contempt. Although we conclude that the contempt citation was improper, the subsequent sale of the property to a good faith purchaser is not affected by our judgment because Hicks failed to seek a stay of the court order permitting the sale.
 

 We reverse the contempt citation and remand the case to the District Court for any further proceedings that may be necessary to bring this matter to a prompt conclusion. At oral argument, a suggestion was made that, under the Bankruptcy Code, it may be possible (without an exercise of the contempt power) to assess certain of the Trustee’s expenses associated with the enforcement of the December 7, 1983 order. We have no occasion here either to determine whether such expenses may be assessed under the Bankruptcy Code or whether they appropriately should be assessed in this case. If properly raised, this issue should be resolved by the District Court on remand.
 

 I. Background
 

 In February 1982, William Magwood III and Florence Hicks concluded a business transaction in which Hicks sold Magwood a bicycle sales and repair business and the
 
 *1079
 
 improved real property in which that business was conducted. In return, Hicks became a secured creditor of Magwood, who operated his business under the name of the L & M Emporium, Inc. (“L & M”).
 

 After Magwood missed several mortgage payments, Hicks gave notice to Magwood on March 15, 1983 that she intended to foreclose the mortgage on the property. Two weeks later, on March 30,1983, L & M filed for bankruptcy, and on March 31, 1983, Magwood filed for bankruptcy.
 

 Apparently unaware of the bankruptcy filings, Hicks foreclosed the mortgage on April 15, 1983. She took possession of the property on May 13, 1983, but returned the keys and control of the property to L & M on June 7, 1983. The bankruptcy court appointed Paul Pearlstein, the appellee in this case, to act as Trustee for the bankrupt estate on June 23, 1983.
 

 Between May and November 1983, the three parties filed motions to protect their conflicting interests in the property: counsel for debtor L & M filed a complaint against Hicks alleging that her earlier mortgage foreclosure violated the automatic stay of execution rule; Hicks filed a motion to lift the stay of execution; and the Trustee filed a turnover action to have the property recovered by the bankrupt estate.
 

 On December 1, 1983, the bankruptcy judge presided at a hearing concerning all three motions. During an adjournment, the parties reached a settlement agreement, which the Trustee summarized orally to the court. The agreement provided that Hicks would obtain two independent appraisals of the property in exchange for possession and control of the property. The oral agreement further provided that,
 

 the property will be listed as quickly as possible after the keys and appraisals have been exchanged with an appropriate real estate agent that is acceptable to the trustee.... [Tjhere will be no rental or sale of the property without the trustee’s written approval.
 

 On December 7, 1983, the bankruptcy judge signed a written order drafted by the Trustee and purporting to embody accurately the terms of the oral settlement agreement. The written order provided that Magwood’s attorney would turn over the keys to the property to the Trustee. Hicks was to provide the Trustee with two current appraisals of the property, in exchange for which the Trustee would give Hicks the keys. Hicks would then take control of the property and repair it for sale. Hicks was to list the property for sale with a competent real estate broker, coordinating the listing with the Trustee. Central to this case, the order further provided that “no
 
 listing
 
 or attempts to sell the property shall take place without Trustee’s prior knowledge and
 
 written approval.”
 

 Soon thereafter, Hicks committed the act for which she was ultimately held in contempt. On December 19, 1983, Hicks executed a listing contract for the property with the firm of Hugh T. Peck Properties, Inc. It is undisputed that the Trustee did not give
 
 written
 
 approval of this listing. Indeed, the Trustee claims that he did not even become aware of this listing contract until April 1984, when the broker produced a potential buyer.
 

 Apparently in response to a new motion by Hicks to enter the property,
 
 [2]
 
 on April 17, 1984, the bankruptcy court issued an order,
 
 sua sponte,
 
 directing Hicks to appear at a hearing and show cause why she should not be held in contempt for her alleged failure to repair the property as required by the December 7 order. On April 25, 1984, the Trustee filed a “Supplemental Opposition to Motion for Ex Parte Relief from Stay” in which he informed the bankruptcy court of the December 19 listing contract.
 
 [3]
 
 In response, the bankruptcy
 
 *1080
 
 court issued,
 
 sua sponte,
 
 a second show cause order on April 30, 1984, requiring Hicks to show cause “why she should not be held in civil or criminal contempt of this Court, or both, and imprisoned or fined, or both,” because she entered into the listing contract without obtaining the Trustee’s written approval, and to show cause why she should not be required to pay the Trustee to obtain appraisals of the property “in lieu of her supplying appraisals to him, which she has failed to do in violation of this Court’s Order dated December 7, 1983.” Finally, Hicks was to show cause why she should not be ordered to pay the Trustee’s “costs and expenses, including legal fees, that have been incurred as a result of her contumacious conduct since December 1, 1983.”
 

 The show cause hearing on these matters occurred on May 4, 1983. After hearing the testimony of Hicks, the bankruptcy judge found the appellant in contempt and instructed the Trustee to draft an order permitting the Trustee to list and sell the property free and clear of all liens. On May 18, 1984, the bankruptcy judge issued this order finding Hicks “in contempt of this Court because of her intentional disregard of the terms of this Court’s Order dated December 7,1983, which was entered into with the consent of Dr. Hicks and her counsel; and specifically because” she entered a listing agreement with Hugh T. Peck Properties without the Trustee’s prior written approval. The contempt order provided that Hicks could “purge herself of her contemptous [sic] conduct” by (1) authorizing the Trustee to sell the property, free and clear of all liens, with all valid liens attaching to the sale proceeds; (2) taking no steps to sell the property except through the Trustee; (3) keeping the property in repair; and (4) “reimbursing] [the] Trustee, for his time expended in the myriad of court hearings and preparation of these hearings, in order to enforce the Court Order of December 7, 1983.” The District Court affirmed this contempt order on August 28, 1984.
 

 The Trustee subsequently sold the real property at issue pursuant to a bankruptcy court order. On September 24, 1984, the bankruptcy court entered an order vesting the property in the Magwood bankrupt estate and permitting the Trustee to sell the property “free and clear of any and all liens.” Although Hicks objected to this sale, the bankruptcy court denied her objection because “in accordance with 11 U.S.C. 363(f)(2) she has consented to Trustee’s sale of the subject property by virtue of the terms and conditions of this court’s orders of December 7, 1983 and May 18, 1984.” On January 11, 1985, the Trustee completed settlement on the sale of the property to a buyer for $132,500.
 

 II. Analysis
 

 A.
 
 The Sale of the Property
 

 At the outset, we conclude that this court has no authority to overturn the Trustee’s January 11,1985 sale of the property. Under section 363(m) of the Bankruptcy Code, a sale made to a good faith purchaser pursuant to section 363(b) or (c) of the Code — as is the case here — cannot be overturned on appeal unless the sale was stayed pending appeal:
 

 The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.
 
 [4]
 

 Hicks never sought to stay the sale, and the sale of the property was clearly one to a good faith purchaser. A “good faith purchaser” is “one who buys in ‘good faith’
 
 *1081
 
 and for ‘value.’ ”
 
 [5]
 
 The purchaser here paid $132,500 for the property. This price is higher than any appraised value of the property presented to the bankruptcy court and thus we conclude that this purchase was certainly for “value.” Additionally, there is not even a hint in the record of any misconduct that could destroy the buyer’s good faith.
 
 [6]
 
 The attack on that portion of the contempt order requiring Hicks to consent to a sale of the property free and clear of all liens and encumbrances is therefore moot.
 
 [7]
 

 B.
 
 Validity of the Contempt Order
 

 Although the parties dispute the jurisdiction of the bankruptcy court to issue citations for civil contempt, all agree that a bankruptcy judge has no power to issue a citation for
 
 criminal
 
 contempt. Such an exercise of the contempt power is specifically prohibited by statute:
 

 A bankruptcy court ... may not ... punish a criminal contempt not committed in the presence of the judge of the court or warranting a punishment of imprisonment.
 
 [8]
 

 Therefore, there can be no doubt whatever that if the bankruptcy judge purported to exercise criminal contempt power, or if the order principally reflected an exercise of criminal contempt power, then the court acted without authority.
 

 The bankruptcy court did not label this contempt as civil or criminal.
 
 [9]
 
 Indeed, in its show cause orders, the court threatened Hicks with both civil and criminal contempt, and with possible imprisonment. We must, therefore, look to the nature of the sanctions themselves to determine whether the contempt citation in this case was civil or criminal. “The test [for civil or criminal contempt] may be stated as: what does the court primarily seek to accomplish by imposing sentence?”
 
 [10]
 
 Civil contempt sanctions are employed only to
 
 coerce compliance
 
 with the court’s order or to
 
 compensate
 
 an injured party for losses sustained because of the contemptuous behavior. The sanctions in a civil contempt must not be punitive.
 
 [11]
 

 
 *1082
 
 1.
 
 Civil Contempt to “Coerce Compliance”
 

 Those sanctions that are designed to coerce compliance are by their very nature “conditional” sanctions; they only operate if and when the person found in contempt violates the order in the future. If a sanction operates whether or not a party remains in violation of the court order, it obviously does not coerce any compliance. Therefore, “the person in civil contempt must be given the opportunity to bring himself into compliance” before the sanctions are imposed.
 
 [12]
 
 In
 
 Lance v. Plum-
 
 mer,
 
 [13]
 
 for example, the Fifth Circuit held that a sanction requiring that an unpaid deputy sheriff give up his badge and cease functioning as a peace officer was not an appropriate civil contempt sanction:
 

 [SJince sanctions imposed in civil contempt proceedings must always give to the alleged contemnor the opportunity to bring himself into compliance, the sanction cannot be one that does not come to an end when he repents his past conduct and purges himself.
 
 [14]
 

 In the instant case, the sanctions clearly did not serve to coerce compliance with the December 7,1983 order. Even if Hicks put herself in complete compliance with that order, she could not avoid the sanctions. In particular, Hicks was forced to give up her right to consent to any sale of the property made free and clear of all liens, and this sanction was imposed on Hicks without regard to whether she obeyed the December 7, 1983 order. Rather than compel future compliance with the December 7, 1983 order, the contempt sanctions seem clearly designed to
 
 punish
 
 Hicks for her past disobedience.
 

 This conclusion is reinforced by the fact that the sanctions imposed have no apparent connection to the contemptuous behavior. No one at oral argument was able to explain any such connection, and forcing Hicks to forego her statutory right to approve the sale of the property has no logical relationship to her past failure to obtain the Trustee’s written approval before listing the property. Although the show cause orders allege that Hicks had also failed to keep the property in good repair and had failed to supply the Trustee with the required appraisals, the bankruptcy court made no findings that Hicks had violated these portions of the order. The
 
 sole
 
 violation found by the bankruptcy court was Hicks’ failure to obtain the Trustee’s written approval before listing the property, and that violation was remedied on May 6 when the Trustee entered into a new listing agreement with Hugh T. Peck Properties, Inc. — almost two weeks
 
 before
 
 the contempt order was issued.
 

 It may be that the court was irritated with Hicks or her counsel because of their persistent efforts to protect Hicks’ interests. Nevertheless, “[i]n the civil contempt setting, the court has no independent interest in vindicating its authority should its orders be violated.”
 
 [15]
 
 In short, it is clear that the court’s contempt citation could not “coerce” Hicks to obtain the Trustee’s written approval for a listing because the matter had been fully resolved before the contempt citation issued. We conclude, therefore, that the sanctions in the contempt order could not have been designed to coerce any compliance with the December 7, 1983 order.
 

 2.
 
 Civil Contempt as “Compensation”
 

 Similarly, we find that the sanctions cannot be defended as compensation to the Trustee for any losses attributable to the contemptuous behavior. Compensatory civil contempt reimburses the injured party
 
 *1083
 
 for losses and expenses incurred because of the contemptuous conduct. This includes losses attributable to the violation and “expenses reasonably and necessarily incurred in the attempt to enforce compliance.”
 
 [16]
 
 The contempt sanctions imposed on Hicks, however, required reimbursement of expenses wholly unrelated to the violation found in this case:
 

 Dr. Hicks shall reimburse Trustee for his time expended in the myriad of court hearings and preparations of these hearings, in order to enforce the Court Order of December 7, 1983. Trustee shall be required to provide his statement of time and expenses to this Court and the Court will then enter a separate order quantifying an award to Trustee, that shall be then paid by Florence Hicks, within such time as the court orders in its order awarding fees.
 

 On its face, it is plain that the order proposes to reimburse the Trustee for expenses unrelated to Hicks’ failure to receive written approval before listing. While only
 
 one
 
 hearing was devoted to this violation, the contempt order required Hicks to reimburse for the “myriad of court hearings and preparations of these hearings” to enforce the December 7, 1983 order without regard to whether the
 
 “myriad”
 
 hearings and preparations were related to the specific violation found by the bankruptcy court. Even the one hearing held with respect to the listing was originally intended to cover several alleged violations ultimately not even addressed by the bankruptcy court. Moreover, we strongly doubt whether
 
 any
 
 such expense was “necessarily incurred” to enforce the December 7, 1983 order. Once the Trustee discovered the existence of the listing agreement, there was no need to use a contempt proceeding to renegotiate a more acceptable listing agreement. In fact, the Trustee himself did not even request a contempt proceeding; instead, the bankruptcy court
 
 sua sponte
 
 ordered the show cause hearing on
 
 several
 
 issues — including the listing agreement. Furthermore, even before the contempt order issued, the Trustee was able to negotiate a satisfactory listing agreement
 
 with the same broker previously chosen by Hicks.
 

 On this record, we cannot possibly find that the contempt order was crafted to “compensate the complainant for losses sustained.”
 
 [17]
 
 Indeed, we cannot even find that the Trustee sought compensation for the alleged violation of the court’s December 7, 1983 order.
 
 [18]
 
 “A fine imposed by the court in the absence of a motion by the party in interest would transmute the proceeding into a punitive one for criminal contempt.... The effective waiver of the complainant’s interest removes the legal basis for imposition of civil contempt.”
 
 [19]
 

 3.
 
 The “Punitive” Aspects of the Contempt Order
 

 When cut to its core, the disputed contempt order appears designed solely to serve punitive ends. “The purpose of a criminal contempt proceeding is the vindication of the court’s authority by
 
 punishing for a past violation
 
 of a court order.”
 
 [20]
 
 We can find no other purpose here. As we have already shown, the sanctions cannot be defended as either compensatory or remedial in nature. Rather, the sanctions were designed to punish Hicks for her violation of the December 7, 1983 order and, perhaps, for other behavior that the Trustee and the bankruptcy court
 
 *1084
 
 found irritating, such as Hicks’ persistent attempts to remove the automatic stay. With this punitive basis as the sole justification for its action, we find that the bankruptcy court exceeded its statutory authority in attempting to impose sanctions on Hicks for the alleged violation of the December 7 order.
 

 III. Conclusion
 

 The sanctions imposed on Hicks by the contempt citation are punitive in nature. Because the bankruptcy court had no authority to impose such sanctions, we reverse the District Court’s refusal to set aside the contempt citation. We remand this case to the District Court for any further proceedings that may be necessary to bring this matter to a prompt conclusion. Because this case has already been long delayed, the mandate shall issue immediately and the District Court shall give immediate attention to the issues remaining upon remand.
 

 So Ordered.
 

 [1]
 

 . With "apologies to all,"
 
 Illinois v. Gates,
 
 462 U.S. 213, 217, 103 S.Ct. 2317, 2321, 76 L.Ed.2d 527 (1983), we have no occasion to address the difficult questions raised in the amicus briefs because of our resolution of nonconstitutional issues. We expressly decline to resolve: whether there existed statutory or regulatory authorization for the exercise of the power to issue civil contempt citations during the effect of the Interim Rule; whether the exercise of the contempt power by bankruptcy judges is constitutional; whether the 1984 Act authorizes the exercise of the contempt power by bankruptcy judges; whether such an authorization would be constitutional; and whether the civil contempt power is an essential judicial attribute for Article III purposes.
 

 [2]
 

 . The show cause order provides that it was entered "[u]pon consideration of the emergency motion by Florence Hicks for permission and right to enter property to provide maintenance.”
 

 [3]
 

 . At this time, Hicks was once again seeking relief from the automatic stay of execution. The bankruptcy court’s show cause orders seem
 
 *1080
 
 to reflect the court’s exasperation at Hicks' unrelenting efforts to lift the stay.
 

 [4]
 

 . 11 U.S.C. § 363(m) (1982).
 

 [5]
 

 .
 
 In re Bel Air Assocs., Ltd.,
 
 706 F.2d 301, 305 (10th Cir.1983).
 

 [6]
 

 . The misconduct which would destroy a buyer’s "good faith purchaser” status at a judicial sale ordinarily "involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.”
 

 In re Bel Air Assocs., Ltd.,
 
 706 F.2d at 305 n. 11 (quoting
 
 In re Rock Indus. Machinery Corp.,
 
 572 F.2d 1195, 1198 (7th Cir.1978));
 
 see also In re Exennium, Inc.,
 
 715 F.2d 1401, 1404-05 (9th Cir.1983) ("Lack of good faith is generally determined by fraudulent conduct during the sale proceedings.").
 

 [7]
 

 .
 
 See In re Vetter Corp.,
 
 724 F.2d 52, 56 (7th Cir.1983) (“[I]f a party appeals a bankruptcy judge’s order, authorizing and confirming a sale to a good faith purchaser, the order must be stayed pending appeal, otherwise the issue becomes moot on appeal.”);
 
 In re Exennium, Inc.,
 
 715 F.2d at 1404 ("If appeal is sought without a stay, the courts cannot grant relief because they cannot overturn the sale.”).
 

 [8]
 

 . 28 U.S.C. § 1481 (1982). Section 1481 was in effect when the bankruptcy judge attempted to exercise the contempt power in this case.
 

 [9]
 

 . There are, however, some indications that the citation was for criminal contempt. In the contempt order itself, for example, the bankruptcy court found that Hicks had
 
 intentionally
 
 violated the December 7, 1983 order. Such a finding is not required for a civil contempt.
 
 NLRB v. Blevins Popcorn Co.,
 
 659 F.2d 1173, 1183 (D.C.Cir.1981) ("In civil contempt proceedings ... the failure to comply with the court decree need not be itnentional.”). Additionally, while the contempt proceedings in this case were instituted by the court, civil contempt proceedings normally "should be instituted by the parties aggrieved." 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2960, at 587 (1973);
 
 see also WMATA v. Amalgamated Transit Union, National Capital Local Division 689,
 
 531 F.2d 617, 622 (D.C.Cir.1976) ("In the civil contempt setting, the court has no independent interest in vindicating its authority should its order be violated.”).
 

 [10]
 

 .
 
 Shillitani v. United States,
 
 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966).
 

 [11]
 

 .
 
 WMATA v. Amalgamated Transit Union, Nat'l Capital Local Division 689,
 
 531 F.2d at 622,
 
 see also In re Kave,
 
 760 F.2d 343, 351-53 (1st Cir.1985);
 
 NLRB v. Trailways, Inc.,
 
 729 F.2d 1013, 1023 (5th Cir.1984).
 

 [12]
 

 . Newman v. Graddick,
 
 740 F.2d 1513, 1524-25 (11th Cir.1984);
 
 see also Douglass
 
 v.
 
 First National Realty Corp.,
 
 543 F.2d 894, 898 (D.C.Cir.1976) (Holding a sanction to be a criminal contempt sanction because,
 
 inter alia,
 
 "[t]here was no provision affording appellant an opportunity to purge himself.”).
 

 [13]
 

 . 353 F.2d 585 (5th Cir.1965),
 
 cert. denied,
 
 384 U.S. 929, 86 S.Ct. 1380, 16 L.Ed.2d 532 (1966).
 

 [14]
 

 .
 
 Id.
 
 at 592.
 

 [15]
 

 .
 
 WMATA v. Amalgamated Transit Union,
 
 531 F.2d at 622.
 

 [16]
 

 .
 
 Norman Bridge Drug Co. v. Banner,
 
 529 F.2d 822, 827 (5th Cir.1976);
 
 see also In re Kave,
 
 760 F.2d 343, 351 (1st Cir.1985).
 

 [17]
 

 .
 
 WMATA v. Amalgamated Transit Union,
 
 531 F.2d at 622.
 

 [18]
 

 . The Trustee brought the listing by Hicks to the attention of the court in his Supplemental Opposition to Motion for Ex Parte Relief from Stay. In this motion, however, the Trustee requested only expenses attributable to his defense of Hicks’ motions for relief of stay. The Trustee
 
 never
 
 requested expenses arising from Hicks’ listing of the property.
 

 [19]
 

 .
 
 WMATA v. Amalgamated Transit Union,
 
 531 F.2d at 622.
 

 [20]
 

 .
 
 In re Kave,
 
 760 F.2d at 351 (emphasis in original).