In re Eli R. HADDAD, d/b/a Haddad's Appliance Center, d/b/a Eli Haddad's Maytag Home Appliance Center, Debtor.

James A. GIBBONS, Trustee, Plaintiff,

v.

Eli R. HADDAD and Russell Haddad, Defendants.

Bankruptcy No. 4–85–00085G.
Adv. No. 86–4038.

United States Bankruptcy Court,
D. Massachusetts.

Jan. 16, 1987.

Harold Murphy, James Gibbons, Hanify & King, Boston, Mass., trustee.

Eli Haddad, pro se.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

This case presents important questions concerning the statutory and constitutional authority of a bankruptcy court to exercise civil contempt powers. On December 18, 1986, this Court entered a bench order finding Eli R. Haddad (the "Debtor") in contempt of the Court's order of September 29, 1986. The contempt order was entered on the motion of the trustee in bankruptcy, James A. Gibbons (the "Trustee"), after notice to the Debtor and a hearing. The prior September 29th order approved a settlement made in open court between the Debtor and the Trustee obligating the Debtor to remove forthwith from a warehouse certain personal property which had been taken from the Debtor's home and stored at the estate's expense. Because of the conflict of authority concerning the civil contempt power of a bankruptcy court, it is appropriate for the Court to justify its action and to make it clear that it is imposing civil contempt sanctions upon the Debtor, not punishment for criminal contempt. This opinion will also contain the Court's findings in support of its contempt order of December 18, 1986.

The present controversy can be traced back to July 22, 1986, when another judge of this Court entered an order requiring the Debtor and his son, Russell Haddad, pursuant to their stipulation in open court, to vacate the Debtor's residence by August 22, 1986 and to leave the premises in "clean and habitable condition." This order was entered in an adversary proceeding brought by the Trustee against the Debtor seeking occupancy charges and the eviction of the Debtor and his son from the Debtor's home. *Gibbons v. Haddad,* Adv. No. 86–4038 (Bankr.D.Mass. July 22, 1986) (order ordering Debtor to vacate property). Also, on July 22, 1986, the Court entered an order in a separate adversary proceeding authorizing the sale of the home free of liens and free of the interest of the Debtor's wife. *Gibbons v. Haddad,* Adv. No. 86–4048 (Bankr.D.Mass. July 22, 1986) (order authorizing sale of home). On August 22, 1986, the Debtor still occupied the premises. He filed a motion seeking to vacate the July 22nd order, and requested an emergency hearing. The Court denied the motion on August 27, 1986, and entered an order from the bench requiring the Debtor to vacate the premises forthwith. The Court at the same time found the Debtor and Russell Haddad in contempt of the prior order of July 22nd, but did not impose sanctions at that time. The United States Marshall removed the Debtor from the premises on August 29, 1986, and the Trustee was forced to hire a company to remove and store the Debtor's personal property.

On September 29, 1986, the Court held a hearing on the Debtor's motion to regain the personal property in storage. The parties entered into a compromise in open court on that date to the effect that:

1. The Debtor's exemption was reduced from the statutory amount of $7,800.00 to $5,000.00.

2. The Debtor and Russell Haddad were permitted to retrieve the property in storage at no cost to them for the storage;

3. The Trustee agreed to advance $750.00 to the Debtor, to be applied against the Debtor's exemption, in order for the Debtor to lease a truck to move the property, with the check to be made payable directly to the lessor upon notification by the Debtor to the Trustee of the name of the leasing company;

4. The Trustee, the Debtor and the Debtor's son agreed to drop all claims against each other.

Transcript, pages 2–9 (Afternoon Session, September 29, 1986). In its bench order of September 29th approving the settlement as in effect immediately, the Court ordered the Debtor to remove his property. The Court stressed several times that the property was to be moved forthwith so that further cost to the estate could be avoided. *See* Transcript, pages 6–7, 8–9 (Afternoon Session, September 29, 1986).

Subsequent to that hearing, the Debtor picked up some clothes and personal effects, but he made no attempt to remove most of the property being stored. The Trustee sent a written memorialization of the settlement agreement to the Debtor, which he refused to sign. The estate, in the meantime, had been paying $300.00 per month to store the property in addition to having paid the cost of transporting the property to the warehouse.

## DISCUSSION

### I. *Contempt Power of Bankruptcy Court in General*

This issue is one of first impression in this Circuit after the Supreme Court decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). There is a division of authority concerning whether bankruptcy courts have civil contempt power. The seminal case asserting that civil contempt power survived *Marathon* is *Johns-Manville Sales Corp. v. Doan (In re Johns-Manville Corp.)*, 26 B.R. 919 (Bankr.S.D.N.Y.1983). In that case, the court stated:

> [T]here is nothing unconstitutional in the grant of a contempt power to the bankruptcy court. There is inherent in the power of every court the power to stay proceedings in order to control the disposition of cases on its docket ... This principle should follow regardless of whether the court is a state or federal court, and regardless of whether, if a federal court, it is a special court or one of limited jurisidction.... [A]ny conduct which disrupts or threatens the inherent power of a court to control proceedings or to maintain the dignity and efficiency of the judicial process should in the first instance be punished by that court. This premise is even more appropriately applied ... where the conduct complained of is a knowing violation of an Act of Congress as well as this Court's order.

*Johns-Manville*, 26 B.R. at 924. Other courts have agreed, similarly concerned with preserving what is perceived to be the inherent right of the bankruptcy court to control its courtroom and enforce its orders. *Better Homes of Virginia, Inc. v. Budget Service Co. (In re Better Homes of Virginia, Inc.)*, 52 B.R. 426, 429 (E.D.Va. 1985) *aff'd on other grounds*, 804 F.2d 289 (4th Cir.1986); *In re L.H. & A. Realty, Inc.*, 62 B.R. 910, 918 (Bankr.D.Vt.1986); *Sundstrom Mortgage Co. v. 2218 Bluebird Limited Partnership (In re 2218 Bluebird Limited Partnership)*, 41 B.R. 540, 544 (Bankr.S.D.Cal.1984). *See In re Depew*, 51 B.R. 1010 (Bankr.E.D.Tenn.1985).

Courts holding that bankruptcy courts do not have contempt powers regard the power to hold a party in contempt as something so inherently judicial and, impliedly, so inherently severable from other bankruptcy court powers as to be capable of exercise

only by Article III courts. They have adopted this view in interpretation of the legislative mandate to bankruptcy courts as well as in resolution of the underlying constitutional question. *See, e.g., Tele-Wire Supply Corp. v. Presidential Financial Corp. (In re Industrial Tool Distributors, Inc.)*, 55 B.R. 746, 751–52 (N.D.Ga. 1985) (delegation of contempt power to bankruptcy judges which arguably exists under 11 U.S.C. § 105 is unconstitutional); *Omega Equipment Corp. v. John C. Louis Co., Inc. (In re Omega Equipment Corp.)*, 51 B.R. 569, 571–73 (D.D.C.1985) (the power to sanction or punish for contempt is the "distinguishing characteristic of an officer who exercises the sovereign's judicial power, and of no other."); *Lindsey v. Cryts (In re Cox Cotton Co.)*, 24 B.R. 930 (E.D.Ark. 1982), *vacated on other grounds sub nom., Lindsay v. Ipock*, 732 F.2d 619 (8th Cir. 1984), *cert. denied sub nom., Cryts v. French*, 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984) (contempt power cannot be separated from the judicial power under Article III). *But see In re Silver*, 46 B.R. 772, 774 n. 2 (D.Col.1985) (implying that bankruptcy courts do have contempt power). *Cf. Hicks v. Pearlstein (In re Magwood)*, 785 F.2d 1077, 1078 (D.C.Cir.1986) (court skirted the larger constitutional issue by ruling that the matter was one of criminal contempt rather than civil contempt).

All of these decisions, however, came prior to the amendment made in 1986 to the legislative mandate of bankruptcy courts and prior to the most recent Supreme Court decisions on Article III. We now consider the effect of these developments on the issue before us.

## II. *Legislative Authority for Civil Contempt Power*

Recent amendments to the Bankruptcy Code indicate that Congress intends bankruptcy courts to have authority to exercise civil contempt powers. In 1986, Congress added a second sentence to § 105(a) of the Bankruptcy Code, so that the subsection now reads as follows:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a), as amended by the Bankruptcy Judges, United States Trustees, and Family Farmers Bankruptcy Act of 1986, P.L. 99–554, 100 Stat. 3088 (Oct. 27, 1986) (the "1986 Amendments").

Prior to the 1986 Amendments, there had been some question concerning the statutory sources of a bankruptcy court's civil contempt power. 28 U.S.C. § 1481, as inserted by § 241 of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, 92 Stat. 2549 (Nov. 6, 1978), provided that "[a] bankruptcy court shall have the powers of a court of equity, law, and admiralty, but may not enjoin another court or punish a criminal contempt not committed in the presence of the judge of the court or warranting a punishment of imprisonment." 92 Stat. 2668. Section 402(b) of the Bankruptcy Reform Act of 1978 provided that new 28 U.S.C. § 1481 would become effective on April 1, 1984. 92 Stat. 2682. Because of the jurisdictional crisis created by *Marathon*, this effective date was postponed four times pending passage of comprehensive legislation.[1] The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, 98 Stat. 333 (July 10, 1984) (the "1984 Amendments"), then proceeded to create confusion. The 1984 Amendments became effective on July 10, 1984. Section 113 thereof amended Section 402(b) of the Bankruptcy Reform Act of 1984 by striking out "shall take effect on June 28, 1984" and inserting "shall not be effec-

---

**1.** *See* Pub.L. No. 98–249, 98 Stat. 116 (March 31, 1984) (to May 1, 1984); Pub.L. No. 98–271, 98 Stat. 163 (April 30, 1984) (to May 26, 1984); Pub.L. No. 98–299, 98 Stat. 214 (May 25, 1984) (to June 21, 1984); Pub.L. No. 98–325, 98 Stat. 268 (June 20, 1984) (to June 28, 1984).

tive." 98 Stat. 343. This change was clear enough, but § 121(a) of the legislation also amended §§ 402(b) & (e) the Bankruptcy Reform Act of 1978 by striking out "June 28, 1984" and inserting "the date of enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984." 98 Stat. 345. Thus we have one of Congress' clumsiest performances. Under § 113, § 1481 on contempt powers would never go into effect. But under § 121, it would be effective on July 10, 1984, the date of enactment of the 1984 Amendments.

Most courts have concluded that 28 U.S.C. § 1481 never became effective, reasoning that § 121(a) was intended again to postpone the effective date of § 1481 so as to take care of the hiatus which then existed between June 28th and July 10th. *SEC v. Danning (In re Carter)*, 759 F.2d 763, 766 (9th Cir.1985); *see City National Bank of Miami v. General Coffee Corp. (In re General Coffee Corp.)*, 758 F.2d 1406 (11th Cir.1985); *In re Amatex Corp.*, 755 F.2d 1034, 1037 n. 2 (3d Cir.1985); *Thistlethwaite v. First National Bank of Lafayette (In re Exclusive Industries Corp.)*, 751 F.2d 806, 807 n. 1 (5th Cir.1985). *But see In re Better Homes, Inc.*, 52 B.R. 426, 430 (E.D.Va.1985), *aff'd on other grounds*, 804 F.2d 289 (4th Cir.1986) (Congress, through § 121, intended that § 1481 remain effective). Until the 1986 Amendments, therefore, courts seeking to divine the contempt powers of bankruptcy judges had as their only source 11 U.S.C. § 105(a), a statute which contained one sentence giving the "court" general authority to issue orders which are "necessary or appropriate" to carry out the provisions of the Bankruptcy Code. As discussed, courts have differed in their interpretation of this general language. Some courts regarded that prior version of § 105(a) as too modest a grant of authority to include contempt powers for bankruptcy courts. *Omega Equipment Corp. v. John C. Louis Co., Inc. (In re Omega Equipment Corp.)*, 51 B.R. 569, 572–73 (D.D.C.1985).

The second sentence, which was added to § 105(a) by the 1986 Amendments, puts to an end any question as to whether Congress intends the first sentence to in-

vest bankruptcy courts with the power to enforce their own orders. If they can do so *sua sponte*, they certainly can act, as here, upon the motion of a party. Nor can there be any doubt that the reference in § 105(a) to "court" includes a bankruptcy judge. The present bankruptcy case and the underlying adversary proceeding have been referred to this Court by the district court under a general reference, pursuant to 28 U.S.C. § 157. The adversary proceeding, in which the Trustee sought possession of the Debtor's home, is a core proceeding which bankruptcy judges may adjudicate. 28 U.S.C. § 157(b)(2)(E). The referral of jurisdiction to adjudicate core proceedings includes the jurisdiction to adjudicate civil contempt arising within the core proceeding. *Tele-Wire Supply Corp. v. Presidential Financial Corp. (In re Industrial Tool Distributors, Inc.)*, 55 B.R. 746, 748–49 (N.D.Ga.1985). This is confirmed by 11 U.S.C. § 105(c), added by the 1984 Amendments, which requires reference to the powers of bankruptcy judges under U.S.C. Title 28 for a determination of the extent to which they may exercise powers conferred upon the "court" in title 11. Perhaps most significant, at the time of the passage of the 1986 Amendments, all eleven circuits had adopted a local rule or order referring all cases and proceedings to the bankruptcy judges for their districts. Congress, therefore, must be held to an understanding that the grant of contempt powers to the "court" under the 1986 Amendments was in effect a grant of such powers to bankruptcy judges in core proceedings. In fact, in the only mention of the amendment to § 105(a) in the legislative history to the 1986 Amendments, Sen. Orrin Hatch expressed an understanding that: "[the amendment] allows a *bankruptcy court* to take any action on its own, or to make any necessary determination to prevent an abuse of process and to help expedite a case in a proper and justified manner." 132 CONG.REC. S5092 (daily ed. Oct. 3, 1986) (statement of Sen. Hatch) (emphasis added). This passage indicates an intent by Congress that § 105(a) be applied by the bankruptcy judge hearing the matter.

We therefore conclude that under the 1986 Amendments Congress intended this Court to have the power to enter the December 18th order. The introduction of the new language to § 105(a) injects one element which did not exist previously: clear statutory authority.

### III. *Validity of Civil Contempt Powers Under Separation of Powers Doctrine*

To hold only that there has been a legislative grant of civil contempt powers to bankruptcy courts would beg the major question surrounding the exercise of such powers. The question remains: may bankruptcy courts validly exercise those powers under the separation of powers doctrine embodied in Article III of the Constitution?

The civil contempt powers of a bankruptcy court should not be viewed in isolation from the entire statutory framework within which bankruptcy courts operate. Unfortunately, some doubt surrounds the validity of this framework. One bankruptcy scholar put it this way: "The best that can be said of the 1984 Amendments to the new Code is that a hitherto unacceptable situation has now been rendered intolerable by a process that reflects no credit on any branch of the federal government." Countryman, *Scrambling to Define Bankruptcy Jurisdiction: The Chief Justice, the Judicial Conference, and the Legislative Process*, 22 HARV.J.LEGIS. 1, 1 (1985). Recent decisions of the Supreme Court have, however, lowered the intolerability level by providing support for the validity of the 1984 Amendments.

The separation of powers doctrine is easier stated in terms of the text of Article III than it is understood, or understandable, in light of the substantial judicial gloss that has been placed upon it. This gloss has been described as consisting of "arcane distinctions and confusing precedents." *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. at 90, 102 S.Ct. at 2881 (J. Rehnquist, concurring in judgment). Under Article III, judges exercising "the judicial power of the United States ... hold their offices during good behavior, and shall, at stated times, receive for their ser-

vices a compensation, which shall not be diminished during their continuance in office." U.S.CONST. Art III, § 1. The framers intended Article III to protect litigants from judges who are subject to legislative influence, as well as to protect the judiciary from encroachment by Congress. *Commodities Futures Trading Commission v. Schor*, —— U.S. ——, 106 S.Ct. 3245, 3256, 92 L.Ed.2d 675 (1986). Bankruptcy judges, having neither life tenure nor protection against reduction in compensation either before or after the 1984 Amendments, obviously may not exercise "the judicial power of the United States" as that concept is embodied in Article III.

In *Marathon*, the Court grappled with the limits which Article III places upon bankruptcy courts. Justice Brennan, writing for a plurality of four justices, believed that the broad grant of jurisdiction to bankruptcy judges under § 241(a) of the Bankruptcy Reform Act of 1978 failed to qualify within the so-called "public rights" exception to the requirements of Article III. He conceded that a discharge in bankruptcy may well be a "public right." But he distinguished the restructuring of debtor-creditor relations, which he viewed as "at the core of the federal bankruptcy power," *Marathon*, 458 U.S. at 71, 102 S.Ct. at 2871, from the adjudication of private rights based upon state law, such as a breach of contract action brought by a Chapter XI debtor, the matter before the court. Justice Rehnquist, writing for himself and Justice O'Connor, also viewed the breach of contract action in isolation and not as an integral part of the judicial machinery necessary for the restructuring of debtor-creditor relations. *Id.* at 91, 102 S.Ct. at 2881 (J. Rehnquist, concurring in judgment). Justice White, in dissent, pointed out that a distinction based upon state-created rights is a slender reed, because the adjudication of the claims of creditors in bankruptcy recurringly depends upon state law. *Id.* at 96–97, 102 S.Ct. at 2884–85 (J. White, dissenting).

In *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), the court

held that Article III did not prohibit Congress from imposing a system of binding arbitration to reduce disputes, with only limited review by Article III judiciary. The statute in question used arbitration as the mechanism for resolving disputes among participants in a pesticide registration program which required payment of compensation by later registrants for the use of data submitted by prior registrants. In answer to the argument that such disputes involve private rights entitled to adjudication under the protection of Article III, the court rejected the notion that a public rights/private rights dichotomy provides a bright line for determining the requirements of Article III, pointing out that this rationale did not command a majority in *Marathon. Thomas,* 473 U.S. at ——, 105 S.Ct. at 3336. It summarized *Marathon* in this fashion: "The court's holding in that case establishes only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without the consent of the litigants, and subject only to ordinary appellate review." *Id.* at ——, 105 S.Ct. at 3334–35. The Court upheld the artitration scheme and concluded: "Our holding is limited to the proposition that Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, may create a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Id.* at ——, 105 S.Ct. at 3340.

In *Commodity Futures Trading Commission v. Schor,* —— U.S. ——, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), the Court continued to chart a course independent of the plurality opinion in *Marathon.* It did so to such an extent that it invoked the dissent of the author of the *Marathon* plurality opinion, Justice Brennan (joined in dissent by Justice Marshall). The Court in *Schor* ruled that the Commodity Futures Trading Commission did not violate Article III by adjudicating a state law counterclaim in Commission proceedings initiated against a commodity broker by a customer seeking reparations for allegedly fraudulent and manipulative conduct under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* In arriving at this conclusion, the court balanced the values of Article III against competing constitutional values and legislative responsibilities, which was the approach advocated by Justice White in his dissent in *Marathon. See Marathon,* 458 U.S. at 115, 102 S.Ct. at 2894 (J. White dissenting). The Court in *Schor* spoke of the need to weigh various factors, and of the importance of keeping in mind the practical effect that the action in question will have upon the role assigned to the judiciary by Article III. *Schor,* —— U.S. at ——, 106 S.Ct. at 3258. The Court set forth four factors to be considered: the extent to which essential attributes of judicial power are reserved to Article III courts; the extent to which the non-Article III forum exercises powers normally vested only in Article III courts; the origins and importance of the rights to be adjudicated; and the concerns that motivated Congress to depart from the requirements of Article III. *Id.* The court noted that an Article III court, the district court, retained substantial controls over proceedings before the Commission. The district court reviewed Commission fact findings under a weight of the evidence standard rather than the clearly erroneous standard before the Court in *Marathon,* used a standard of *de novo* review of Commission legal rulings (as in *Marathon* ), and retained the sole power to enforce Commission orders. *Id.* at ——, 106 S.Ct. at 3258–59. The Court also compared the Commission's narrow area of concern to what was perceived to be a broad area before the Court in *Marathon,* consisting of civil proceedings related to a bankruptcy case but not arising under the bankruptcy law or arising in a pending bankruptcy case. *Id.* at ——, 106 S.Ct. at 3258. In light of all of these factors, and in light of the legitimate concerns of Congress for integrity in commodity trading, the court concluded that the state law basis of the counterclaim should not have the talismanic effect of incurring a violation of Article III. Id. at ——, 106

S.Ct. at 3259 (citing Justice White's dissenting opinion in *Marathon*).

In the present case, we are not concerned with the adjudication of rights based upon state law; nor are we concerned with the adjudication of private rights as that term is used in the context of Article III. *Marathon, Thomas* and *Schor* all concede that matters involving the restructuring of debtor-creditor relations are at the core of the federal bankruptcy power and therefore are of a "public rights" nature. Nothing could be more intimately involved with such restructuring than possession of a debtor's property in order to permit a sale of the property to pay creditors, which is the situation here. Thus the origin of the rights adjudicated in the present case, one of the factors set forth in *Schor*, is favorable toward resolution by an Article I court.

The concerns which drove Congress to depart from the requirements of Article III can hardly be questioned. Congress wished to have a separate, expert court to quickly hear and finally decide matters concerning debtors' estates, yet also wanted to retain the "significance and prestige" of the district courts. Countryman, *supra*, at 5-11. Nor can it be charged that jurisdiction for adjudication of traditional bankruptcy matters has been normally vested in Article III courts. Congress was dealing with an area of specialization that has deep roots outside of Article III. Those members of Congress who wanted to make bankruptcy judges members of the Article III judiciary met with strong opposition from various sectors, not the least of which was the federal judiciary. *See* Countryman, *supra* at 7-10.

The extent to which essential attributes of judicial power are reserved to Article III courts under the 1984 Amendments, the final factor mentioned in *Schor*, also favors this Court's exercise of jurisdiction here. Unlike the situation present in *Marathon*, we are concerned here with the core of bankruptcy administration, an area of law for which Article III courts have never had prime responsibility. Nor are Article III courts deprived of all involvement. The authorization given the district court to review the decision of this Court is far broader than the review power before the Court in *Thomas*, where the district court could review only for fraud, misrepresentation or other misconduct. The decision which this Court entered on December 18 is subject to reversal by an Article III court if it is erroneous in law or clearly erroneous in fact. 28 U.S.C. § 158; BANKR.R. 8013. *See* BANKR.R. 9020 and committee commentary thereto (civil contempt not subject to provisions of rule 9020).

Essentially these same considerations provided the basis for seven circuit Courts of Appeal who considered the question to affirm the validity of the Emergency Rule adopted in response to *Marathon*. *See Stewart v. Stewart (In re Stewart)*, 741 F.2d 127 (7th Cir.1984); *Lundquist v. Metropolitan Bank of Bloomington*, 730 F.2d 1204 (8th Cir.1984); *Oklahoma Health Services Federal Credit Union v. Webb*, 726 F.2d 624 (10th Cir.1984); *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574 (2d Cir. 1983); *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190 (3d Cir. 1983), *cert. denied* 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 315 (1983); *White Motor Corp. v. Citibank, N.A.*, 704 F.2d 254 (6th Cir.1983); *Braniff Airways, Inc. v. Civil Aeronautics Board (In re Braniff Airways, Inc.)*, 27 B.R. 231 (N.D.Tex.1983), *aff'd per curiam*, 700 F.2d 214 (5th Cir. 1983), *cert. denied*, 461 U.S. 944, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983). The jurisdictional scheme created by the 1984 Amendments is based upon the Emergency Rule. The fact that the Emergency Rule did not require the district court to give deference to the findings of the bankruptcy judge is inconsequential in view of all of the other aspects of the Emergency Rule which these courts of appeal believed favored its validity and which are also present here as the result of the 1984 Amendments. *Danning v. Lummis (In re Tom Carter Enterprises, Inc.)*, 44 B.R. 605, 609-10 (C.D.Cal.1984).

In view of the substantial involvement of Article III courts in this Court's adjudications under the 1984 Amendments, and in view of the existence in this case of all four

of the factors deemed favorable in *Schor* for the exercise of jurisidction by a non-Article III tribunal, the exercise of civil contempt powers cannot be viewed in a vacuum. First and foremost, the clear teaching of *Marathon, Thomas,* and *Schor* is that the entire jurisdictional scheme must be examined, not merely the particular adjudication under review. Beyond this, there is an aspect of non-severability which is particularly inherent in the exercise of civil contempt powers. Nothing could be more intimately related to a court's jurisdiction to enter an order than its jurisdiction to enforce that order through civil contempt proceedings.

Our conclusion is reinforced when the other clearly constitutional powers of the bankruptcy court are compared with the purpose and effect of civil contempt powers. Civil contempt orders serve either or both of two purposes: (1) to compel or coerce obedience of a court order; and (2) to compensate parties for losses resulting from the contemptor's non-compliance with a court order. *United States v. United Mine Workers of America,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). The effect of the exercise of the contempt power should be that the injured party is made whole and the court's order is obeyed, thus restoring the matter to the situation which existed before the contemptor disregarded the court's order.

The exercise of civil contempt powers is consistent with, and indeed virtually indistinguishable from, exercise of the power given the court by 11 U.S.C. § 362(h) to enter judgment for both compensatory and punitive damages as the result of a willful violation of the automatic stay. In *Better Homes of Virginia, Inc. v. Budget Services Co.,* 804 F.2d 289 (4th Cir.1986), the bankruptcy court had imposed both compensatory and punitive damages under the statute. The fourth circuit held that the exercise of such powers was valid under *Marathon.* It reasoned, as we have here, that a violation which is an integral part of a core proceeding poses no constitutional problems. *Better Homes of Virginia,* 804 F.2d at 292. The court of appeals confined its discussion to § 362(h). The district

court, which had also affirmed the action of the bankruptcy judge, based its decision upon the constitutional validity of civil contempt powers exercised pursuant to 11 U.S.C. § 105(a) and 28 U.S.C. § 1481 (which it ruled was still in effect despite the 1984 Amendments). *See Better Homes of Virginia, Inc. v. Budget Services Co. (In re Better Homes of Virginia, Inc.),* 52 B.R. 426 (E.D.Va.1985).

We fail to see *any* difference between the civil contempt power exercised in the present case and the imposition of damages under § 362(h). Indeed, the imposition of punitive damages under § 362(h) goes beyond what this court did in its bench order of December 18th. Arguably, both powers are authorized by statute. The exercise of both involves a core proceeding. Both powers serve to remind parties involved in a bankruptcy case to obey and honor the law. Both compensate persons injured by another's failure to obey the law as set down. The desired effects—compensation and a return to the status quo before the law was disobeyed—are the same.

The imposition of sanctions for civil contempt serves essentially the same purpose as other constitutional powers within the purview of § 105(a). A proceeding requesting injunctive relief follows the same path as a proceeding for civil contempt. Both proceedings are designed to protect vital interests, one the very processes of the court and the other the liquidation or rehabilitation of the debtor before the court. Again, both will involve core proceedings. Courts have held that bankruptcy courts have unquestioned jurisdiction to issue injunctions. For example, in *Manville Corp. v. Equity Security Holders Committee (In re Johns-Manville Corp.),* 801 F.2d 60 (2nd Cir.1986) the bankruptcy court had enjoined the debtor's equity committee from pursuing an action in the Delaware courts seeking to compel the debtor to hold a shareholders' meeting. The Second Circuit had no difficulty in ruling that § 105(a), as it existed prior to the 1986 Amendments, provided ample jurisdiction for the issuance of such an injunction in a

core proceeding. *Manville Corp.*, 801 F.2d at 63–64.

The existence of civil contempt powers in bankruptcy courts is also consistent with their other unquestioned powers. Bankruptcy courts have inherent power to enforce settlement agreements between parties. *In re Bienert*, 48 B.R. 326, 328 (N.D. Iowa 1985). And they have limited contempt powers through BANKR.R. 9011(a) and 7037, which authorize imposition of sanctions on parties and their attorneys for abuse of pleading process and discovery abuse. A bankruptcy court's power to sanction for abuse of process has been upheld as constitutional. *In re Silver*, 46 B.R. 772, (D.Col.1985). Other powers to impose sanctions are contained in 11 U.S.C. § 303(i) (improper filing of involuntary petition) and in 11 U.S.C. § 523(d) (inappropriately seeking to have a consumer debt declared nondischargeable).

All of the foregoing powers, including injunction powers and § 362(h) powers, contain some element of civil contempt in them. They are directed at enforcing the Bankruptcy Code and court orders, or protecting the process of rehabilitation or liquidation, and they compensate or protect parties in order to achieve these goals. They all are exercised by the bankruptcy court without constitutional taint. It would border on legal hallucination to regard these powers as properly exercisable by a non-Article III tribunal and yet hold that such a tribunal may not exercise civil contempt powers. If there is a distinction between the two, it is too fine for the broad considerations involved in Article III.

Finally, it is consistent with the general goals of Congress in enacting the Bankruptcy Code that bankruptcy courts have civil contempt powers. Congress desired a bankruptcy court system which would "operate efficiently and quickly." H.R.REP. No. 595, 95th Cong. 1st Sess. 13 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5974. Congress considered speed and efficiency "essential" because "delay only operates to devalue assets, hinder financial rehabilitation, and prevent the exercise of rights." *Id.*

In this case, lack of a civil contempt power would cause the estate to run up further expense to store the Debtor's furniture and perhaps never receive reimbursement for the costs of a situation which the Debtor brought about through his refusal to obey two prior court orders. Absent this Court having contempt powers, the Debtor could continue to ignore the Court's orders while the Trustee attempts to have these orders given final effect by a district court with an already overburdened docket. *Cf. In re Silver*, 46 B.R. 772, 774 (D.Col. 1985) (approving bankruptcy court imposition of sanctions for abuse of process in part because of concern about rise in number of federal cases). This Court would be a paper tiger, issuing orders which could be disregarded by anyone wishing to have the benefit of a delay in the enforcement of those orders.

The power to impose sanctions for civil contempt is, of course, an inherently judicial power. But so was the power to adjudicate the counterclaim in *Schor*, as the Court frankly conceded. And so is every adjudicatory power exercised by Article I tribunals. The process of interpreting Article III has gone well beyond ending the analysis upon the discovery of a judicial power being exercised by an Article I tribunal. The particular power must now be considered, not in isolation, but in the context of all of the considerations discussed here. With all of these considerations in mind, the power to impose civil contempt should have no more talismanic effect here than did the private, state law aspects of the claim in *Schor*. In short, characterization of the power as judicial in nature is only the beginning rather than the end of the inquiry. *In re L.H. & A. Realty, Inc.*, 62 B.R. 910, 917 (Bankr.D.Vt.1986); *Budget Service Co. v. Better Homes of Virginia, Inc. (In re Better Homes of Virginia, Inc.*, 52 B.R. 426, 430 (E.D.Va.1985)); *aff'd on other grounds* 804 F.2d 289 (4th Cir. 1986).

We recognize that proposed Bankruptcy Rule 9020 would limit this Court to certifying the contempt question for decision by the district court if a timely objection is made. But the committee notes to PROP.

BANKR.R. 9020 indicate that the rule was drafted in this fashion because of the Article III question. It was, moreover, drafted prior to *Schor* and the 1986 Amendments. In light of this, and bearing in mind that the rule is only proposed, we decline to take its suggestion. We regard the rule as an aberration of the traditional way in which a disputed constitutional question is decided, i.e., by court decision rather than court rule.

We express no opinion on the extent of the authority of this Court to impose criminal contempt, confining ourselves as we must to the present case. In the Bankruptcy Reform Act of 1978, Congress amended Title 28 of the United States Code by inserting § 1481, initially to be effective April 1, 1984, wherein it gave bankruptcy courts criminal contempt powers only with respect to contempt committed in the presence of a judge, and then only if the contempt did not warrant punishment by imprisonment. As discussed, that statute was apparently repealed by the 1984 Amendments. *See e.g., SEC v. Danning (In re Carter),* 759 F.2d 763 (9th Cir.1985). Yet it forms the basis of present BANKR.R. 9020, a court rule which grants limited criminal contempt powers to the Court. One court, having *Marathon* in mind, took a more restrictive view of this Court's criminal contempt powers, regarding the grant to bankruptcy courts in 11 U.S.C. § 105(a) of authority to issue any order as "necessary or appropriate to carry out the provisions of this title" as apparently excluding all criminal contempt powers because such powers are necessary only to "vindicate the dignity of the court and are collateral to the bankruptcy proceedings." *Better Homes of Virginia, Inc. v. Budget Service Co. (In re Better Homes of Virginia, Inc.,* 52 B.R. 426, 430 (E.D.Va.1985); *aff'd on other grounds,* 804 F.2d 289 (4th Cir.1986) (emphasis deleted). Under the Bankruptcy Act of 1898, however, bankruptcy judges' possession of limited criminal contempt powers was considered appropriate. *See, e.g., Fernos—Lopez v. U.S. District Court,* 599 F.2d 1087 (1st Cir. 1979). We note that the National Bankruptcy Conference concludes that bankruptcy courts may properly exercise criminal contempt powers to the same extent that Congress intended they have them under § 1481, that is, where the contempt is committed in the presence of the judge and does not warrant punishment by imprisonment. Greenfield, *Report—The National Bankruptcy Conference's Position on the Court System Under the Bankruptcy Amendments and Federal Judgeship Act of 1984 and Suggestions of Promulgation,* 23 HARV.J.LEGIS. 357, 360–61 (1986).

## IV. *Conclusion and Findings on Damages*

In issuing the bench order of December 18, 1986 the Court was exercising permissible civil contempt powers. The Court stated at the time that it was acting in "punishment" of the Debtor by voiding his remaining exemption of $5,000. Punishment connotes the exercise of criminal contempt powers, which the Court does not purport to do. The Court intends, rather, to compensate the estate for the damage caused it by the Debtor's contempt of both the order of July 22, 1986 requiring him to vacate the home and the order of September 29, 1986 requiring him to remove his property from storage. The estate expended $4,273.00 for the pickup, handling, packing and moving of property from the Debtor's home to the warehouse in late August of 1986. The storage charge was $300 per month commencing on or about August 29, 1985. At the time of the December 18th order, these charges totaled approximately $1050. The estate had also incurred substantial legal expense in connection with enforcing those two prior orders. The Court finds that the estate incurred damages of no less than $5,000, as of December 18, 1986, by reason of the Debtor's contempt of the two orders. The contempt of the July 22nd order alone has damaged the estate in excess of $5,000. The contempt of the September 29th order has damaged the estate as of December 18, 1986 in the sum of $3,000. In any event, we view the two orders and their contempt as inextricably linked.

Because the Debtor has appealed from the bench order of December 18, 1986, the

Court will not issue a written order memorializing that bench order.