**In re Steven R. BABBIDGE, Debtor.**

**Bankruptcy No. 89–61045.**

United States Bankruptcy Court,
W.D. Missouri.

Oct. 6, 1994.

Carson W. Elliff and JoAnne Jackson, Springfield, MO, for Mr. Seyferth.

Erlene W. Krigel and Gerald Handley, Kansas City, MO, for Mr. Opdahl.

Raymond Plaster, for Trustee Thomas J. Carlson.

### MEMORANDUM OPINION AND ORDER

KAREN M. SEE, Bankruptcy Judge.

On March 7, 1994, a hearing was held on Timothy Seyferth's Amended Second Motion for Contempt, the final motion in a series of contempt pleadings. The bankruptcy trustee supported Mr. Seyferth's current motion and previous motions for contempt, and by order entered January 31, 1994, was permitted to intervene in the contempt proceedings which are the subject of this order. Appearances of counsel were: Carson W. Elliff and JoAnne Jackson for Mr. Seyferth, Erlene Krigel and Gerald Handley for Mr. Opdahl, and Raymond Plaster for Trustee Thomas J. Carlson.

An order of civil contempt will be entered against Gary Opdahl. The court has reviewed the court file; evidence, arguments and pleadings for previous hearings regarding contempt; and arguments, briefs and evidence produced for this hearing on the Amended Second Motion for Contempt. This order is intended to be a final order in a core proceeding, reviewable by appeal. In the alternative, if it is determined that it should be construed as a report and recommendation pursuant to 28 U.S.C. § 157(c)(1), it shall become final unless a party serves written objections within 10 days pursuant to Bankruptcy Rule 9033(b). Any findings of fact which should be denominated conclusions of law or vice versa shall be so construed.

## I. INTRODUCTION

The motion for contempt and the hearing which are the subject of this order were the culmination of a series of contempt motions and hearings which started in October, 1993. Gary Opdahl has represented since 1991 that he would tender funds he said he was holding as a stakeholder, yet despite an order from a California state court, five orders from the bankruptcy court, and numerous orders made in open court at hearings, Opdahl has failed to turn over the funds or books, records and an accounting which were also ordered to be turned over to the bankruptcy trustee. During the series of contempt hearings, it was finally revealed that Opdahl had misappropriated the funds in July, 1991 and had concealed the act for the next two and one-half years by making false statements under oath in an affidavit and deposition, false statements in pleadings, and false statements made through counsel in open court. Opdahl's concealment of the theft while representing repeatedly to courts and parties that he still had the funds and stood ready to turn them over constitutes a fraud perpetrated on the court and parties and has caused the parties to incur legal expenses.

At the outset, in order to avoid confusion during discussion of numerous pleadings, proceedings and orders, it is noted that five written orders were entered from October 24, 1991 through January 31, 1994, ordering Mr. Opdahl to turn over books and records, an accounting, and funds he supposedly held as a stakeholder. The turnover proceedings have been in two stages, but the fact that there are two stages does not affect Mr. Opdahl's obligation to turn over the items. The second stage merely refined the turnover directive.

The first stage was an adversary action between the trustee on behalf of the estate and Opdahl as a stakeholder of funds and a partner in possession of books and records. The order in the core proceeding determining rights in the funds as between the bankruptcy estate and Opdahl was not appealed and is final. Opdahl was ordered to turn over to the estate the funds and partnership books and records and to provide an accounting. In the first stage, Seyferth intervened after the trial and before the ruling on a motion to reconsider, and the court ordered that his right to claim the funds from the trustee would be preserved, so it was contemplated then that subsequent proceedings would occur involving the trustee and Seyferth.

The second stage of proceedings was between the trustee and Seyferth over whether Seyferth had a secured claim which would give him an interest superior to the estate's in the funds which Opdahl was obligated to turn over but had not yet delivered to the trustee. In the second stage, Seyferth prevailed over the trustee, so the second stage merely refined the earlier directives to permit turnover of the funds directly to Seyferth instead of to the trustee. Substantively, there was no change as to Opdahl, because the earlier turnover order was final. If Opdahl preferred to comply with the earlier order, he could have turned over the funds to the trustee, who would in turn have delivered them to Seyferth after the second-stage order. In addition, Opdahl remained obligated to turn over to the trustee records and an accounting.

Seyferth filed his Second Amended Motion for Contempt because Opdahl has failed and refused to comply with orders to turn over funds held by Opdahl as a stakeholder. The trustee was permitted to intervene in support of Seyferth's Second Amended Motion by an

order entered January 31, 1994. Turnover orders include: the order in the adversary action entered October 24, 1991 for an accounting and turnover to the trustee of funds and partnership books and records; an order denying reconsideration of the 1991 turnover order and preserving Seyferth's right to claim the funds from the estate, entered July 9, 1992; an order entered September 16, 1993, 159 B.R. 532, which held that Seyferth had a secured claim in the bankruptcy case and a perfected security interest in the funds, and which in effect duplicated the 1991 and 1992 turnover orders but permitted turnover directly to Seyferth instead of first turning the funds over to the estate; an order entered December 10, 1993 for an accounting and turnover of the partnership records and the funds; and an order entered January 31, 1994 to produce an accounting and partnership records and to show cause why Opdahl should not be held in contempt.

■ The court concludes it has authority to find Opdahl in civil contempt for failure to comply with any or all of the turnover orders, to order Opdahl to turn over to either the trustee or Seyferth the funds of which he was stakeholder, and to pay the attorney fees and expenses incurred by the estate and Seyferth in their efforts to compel Opdahl to comply with orders of this court and honor his stakeholder obligations.

■ The purpose of civil contempt is to ensure compliance with the lawful orders of a court and to compensate parties who have been damaged by the contempt. Opdahl is ordered to comply immediately with the turnover orders and pay to either Seyferth or the trustee $134,235.25, the amount he misappropriated while holding it as a stakeholder, plus interest from the date Opdahl first received the funds. Opdahl is also ordered to pay attorney fees of $15,885.50 to Seyferth and $18,012.40 to the trustee.

## II. FACTS

The evidence of contempt presented · by movant Seyferth is undisputed. In opposition, Opdahl offered only a box of records supposedly pertaining to the partnerships for the trustee and Seyferth to review in court.

During Opdahl's testimony, he frequently invoked the Fifth Amendment privilege.

Seyferth, seriously injured in an industrial accident, received a settlement for his support. He invested part of the settlement in California limited partnerships formed by Steve Babbidge and Gary Opdahl. The partnerships failed to produce the return promised, so Seyferth sued Babbidge and Opdahl. The parties settled the suit and on September 30, 1983, executed an Assignment of Note, Beneficial Interest Under Mortgage and Beneficial Interest In Certain Limited Partnerships As Collateral Security.

The Settlement Agreement executed by Babbidge and Opdahl assigned to Seyferth, as security for payment of a note payable to Seyferth, "all right, title and beneficial interest" Babbidge and Opdahl had in California limited partnerships named Havendale Plaza Associates, Havendale Plaza Associates I, Havendale Plaza Associates II and 3040 Oakmead Associates. The partnerships held as an asset a note secured by a mortgage ("Crocker note and mortgage") on Florida real estate known as Havendale Plaza. The Settlement Agreement also assigned whatever interest Babbidge and Opdahl had under the Crocker mortgage.

The Crocker note and mortgage were assets of the partnerships, so Babbidge and Opdahl could not grant a security interest in or assignment of the note or mortgage. Instead, they granted a security interest only in their partnership interests, which included the right to distribution of funds eventually received by the partnerships when the Crocker note was paid.

Babbidge and Opdahl failed to pay the settlement note, so Seyferth filed a second suit in California to enforce the Settlement Agreement. He received a summary judgment on May 30, 1989 against Babbidge, Opdahl and Steven R. Babbidge & Associates for $575,378.75, plus interest at the rate of 10%, representing the unpaid principal and interest on the settlement note.

In October 1989, Steven Babbidge filed a bankruptcy case in Missouri. The Crocker note was paid in August 1990, and the Havendale partnerships received $956,000.

Upon payment of the Crocker note to the partnerships, Opdahl opened an account from which he paid certain partnership expenses. After payment of expenses, Opdahl opened a separate account under his exclusive control and deposited the remaining proceeds from the Crocker note. From the second account, Opdahl distributed payments to the limited partners, including himself. Pursuant to the settlement with Seyferth, Opdahl paid his share to Seyferth.

He continued to hold Babbidge's share in the amount of $134,235.25 and represented consistently from 1991 until January 12, 1994, in depositions, affidavits and pleadings filed in this bankruptcy case and in state court in California that he was a mere stakeholder, ready to turn the funds over to the court or the party designated by the court. He claimed he did not distribute the funds due to potential conflicting claims and the filing of Babbidge's bankruptcy case.

In actuality, on July 14, 1991, Opdahl misappropriated the funds to purchase a $425,-000 house, and made a series of false statements to the bankruptcy court and the California state court to conceal the theft until it was revealed on or about January 12, 1994, as will be discussed at a later point. The statements describing himself as a mere stakeholder and offering to turn over the funds to the state court or the bankruptcy court were never accompanied by any actual turnover by Opdahl. It is now clear those statements feigning cooperation and representing that Opdahl had possession of the funds were made in furtherance of a scheme lasting two and one half years to conceal the misappropriation.

Following Opdahl's refusal to turn over Babbidge's share of the distribution from collection of the Crocker note, in February 1991 Seyferth filed a third action in California to obtain the funds from Opdahl. In May, 1991 the state court ordered Opdahl to deposit the funds into court. Opdahl did not comply with the order and did not file an answer. Instead, in July, 1991, Opdahl misappropriated the funds for his own use. Thereafter, Opdahl maintained he was a stakeholder and moved to substitute certain parties for Opdahl, including the bankruptcy trustee and any other parties who claimed to have an interest in the funds.

On October 7, 1991, three months after Opdahl had misappropriated the funds, he filed a false affidavit with the California court (see affidavit attached to Seyferth's first motion for contempt, filed November 22, 1993). In the affidavit Opdahl stated that he was a stakeholder without any personal interest in the funds and that there were conflicting demands to the funds. Despite the fact that Opdahl had failed to comply with the May, 1991 order to deposit the funds, he feigned cooperation by stating in the affidavit that he

> hereby offer[s] to deposit the entire amount with the clerk of this court or deliver same to such person as the court may direct on being discharged from all liability to either Plaintiff or the claimants, in order that they may interplead and settle their claims as between themselves.

The California suit commenced in February, 1991 did not include the bankruptcy trustee or the estate, and overlapped for a time with the trustee's adversary action in bankruptcy court, filed April 3, 1991, in which the trustee sought the accounting and turnover to the estate of the funds and records. After Opdahl sought to substitute the trustee as a party in the California action and the adversary action was filed in bankruptcy court, activity in the California action eventually ceased and the parties continued the litigation in the bankruptcy forum.

The first stage of these protracted proceedings in bankruptcy court was the adversary action filed April 3, 1991, by the trustee against Opdahl. Opdahl's testimony in a deposition on October 11, 1991 was used at the trial of the turnover action. In the deposition, taken three months after the funds were misappropriated, Opdahl testified falsely. For example, in the deposition, page 49, he testified as follows:

> Q. And if I remember correctly, the hundred and thirty-two thousand that's left from the Havendale Plaza partnership as of today which is the 11th, it's in that California account that you previously identified?
>
> A. That's correct.

Q. But will be tendered to the court?

A. That's correct.

In the adversary action, this court entered a two-part order on October 24, 1991. The first part ordered substantive consolidation of limited partnerships into the Babbidge bankruptcy estate. The second part ordered Opdahl to provide an accounting and to turn over to the trustee books and records of the partnerships and the funds from Babbidge's share of the Crocker note which Opdahl said he was holding as a mere stakeholder and would turn over as directed. On July 9, 1992, this court entered an order denying Opdahl's motion for reconsideration of the two-part order. Seyferth sought to intervene after trial and before the order denying the motion for reconsideration was ruled, so in the order denying the motion for reconsideration, it was also ordered that Seyferth had preserved the right to take action to preserve whatever claim he had to the funds without being prejudiced by the turnover order in favor of the trustee against Opdahl. Thus, Opdahl knew at this point that a second stage of proceedings between the estate and Opdahl was contemplated. The turnover portion of that order was not appealed (and on January 13, 1994, the consolidation portion was affirmed).

The second stage of proceedings was the subsequent dispute between the estate and Seyferth over his status as a secured creditor as to the funds supposedly in Opdahl's possession. This dispute was resolved in favor of Seyferth by an order entered September 16, 1993. The order repeated the turnover directive from the 1991 order, which was a final order, but provided that turnover could be made directly to Seyferth instead of first to the estate. *In re Babbidge*, 159 B.R. 532 (Bankr.W.D.Mo.1993). The order noted that "[t]he funds subject to the turnover order apparently are still in Opdahl's possession, although earlier the trustee commenced proceedings to obtain possession of the funds." At that point, Opdahl was still obligated to provide an accounting and the books and records to the trustee and to turn over the funds to Seyferth. Alternatively, Opdahl could have complied with the original 1991 order and turned the funds over to the trustee, who in turn would have delivered them to Seyferth.

On December 10, 1993, in a hearing on a motion for contempt filed by Seyferth, Opdahl, through counsel Jean Maneke, an attorney in the firm of current counsel, Krigel and Krigel, represented that he continued to hold the funds as a stakeholder. This statement to the court was simply false, although the court did not know it at the time. The court again ordered Opdahl to turn over to Seyferth the funds Opdahl had represented he was holding, to turn over to the estate the partnership records and to submit an accounting.[1]

Thereafter, Seyferth filed a second contempt motion. On January 12, 1994 Opdahl filed a response to Seyferth's second motion and revealed that he had "borrowed" the funds on July 14, 1991. Thus, on January 12, 1994, Opdahl revealed for the first time that he had misappropriated the funds on July 14, 1991, which was five months after the California case was filed, two months after the California court ordered Opdahl to deposit the funds, and three months after the bankruptcy adversary action was filed. In October, 1991, three months after the misappropriation, Opdahl filed a false affidavit with the California court and testified falsely in his deposition (which was used in the adversary hearing) that he had possession of the funds and would tender them to the court, and the first turnover order was entered. In Opdahl's January 12, 1994 pleading, in addition to revealing the "borrowing" of the funds, Opdahl also, with great audacity, requested that the amount of funds to be turned over be reduced by $51,000 to compensate Opdahl for attorney fees he allegedly incurred as the stakeholder in protecting the funds.

---

1. In December, 1993, Opdahl objected that Seyferth had not obtained a modification of the stay to seek the funds. Although it appeared unnecessary, in order to address any possible procedural concern, on December 10, 1993, Seyferth and the trustee filed a Stipulation for Modification of Automatic Stay so that Seyferth could continue his effort to recover the funds held by Opdahl.

Opdahl did not comply with the December 10, 1993 order to turnover funds, records and an accounting, so in court on January 13, 1994, Opdahl was ordered to file an accounting by January 21, 1994. On January 21, 1994, Opdahl filed a pleading, which included an affidavit and miscellaneous documents, which Opdahl contends was a sufficient accounting. The court has previously found the pleading was not a sufficient accounting. In the affidavit Opdahl stated, "On July 14, 1991 ... I wired funds in the amount of $140,000.00 to North Carolina to purchase a residence...." The "accounting" consisted of copies of intermittent monthly bank statements with payments listed to unspecified entities and showing some transfers made by Opdahl and some deposits. Opdahl also included the settlement statement from the closing on the North Carolina residence. On January 31, 1994, an order was entered directing Opdahl to produce the partnership records and an accounting and to show cause why he should not be held in contempt.

On March 7, 1994, the court held a hearing on Seyferth's Second Amended Motion for Contempt. The trustee supported the motion (and by an order entered January 31, 1994, was permitted to intervene). The evidence from Seyferth and the trustee was undisputed. In opposition, Opdahl offered a box of documents for the trustee and Seyferth to review for the first time in the midst of proceedings that, according to him, contained the partnership records. During testimony, Opdahl frequently invoked his Fifth Amendment privilege against self-incrimination and refused to answer questions.

Opdahl has pleaded that he is unable to repay the funds he held as a stakeholder which have now been held to be due to Seyferth. However, by Opdahl's own pleadings and testimony (including adverse inferences drawn from invocation of the Fifth Amendment), and through evidence presented by Seyferth, it was demonstrated that before he made representations that he had the funds in his possession as a stakeholder, Opdahl had already taken the funds in order to buy himself a $425,000 house. Opdahl has disposed of that house but still owns a house with a purchase price in excess of $200,000, a 1991 Mercedes Benz car and other late model vehicles. Opdahl testified that he had no funds to repay the misappropriated funds because his income was only $10,000 in 1993, but this statement was countered by evidence that Opdahl was able to pay personal property taxes on his new home and substantial sewer assessments in 1993 for his home in North Carolina.

The court takes notice of prior contempt proceedings beginning in November, 1993 and rejects Opdahl's characterization that the Memorandum Opinion and Order dated September 16, 1993, adjudicating rights to the funds as between Seyferth and the estate, denied Opdahl due process because he was not made a party and was not provided an opportunity to present a defense. By Opdahl's own statements in the affidavit and deposition, he was not an interested party and had no claim to the funds. Opdahl's obligation as a stakeholder of funds was determined in the turnover orders entered before September, 1993 in the adversary action with the trustee. Opdahl has been given the opportunity to comply with this court's orders in three separate hearings regarding contempt. Furthermore, the hearing resulting in this order was originally scheduled for February, 1994 but was continued at Opdahl's request.

Opdahl contends that Seyferth cannot argue that Opdahl's actions in the California state court action demonstrated an intent to mislead the courts as to his intent to turn over the funds because no evidence was presented as to the California action. However, Opdahl was a party to the California case, filed by Seyferth to obtain possession of the funds from Opdahl, and copies of pleadings in the California action were attached to the Seyferth's original Motion for Contempt. Opdahl did not object to the pleadings and has offered no countering testimony regarding his actions in the California case wherein he represented that he was a stakeholder, offered to deposit funds which he knew he had already misappropriated, and moved to substitute other parties, including the bankruptcy trustee and any other parties with a potential interest in the funds.

Opdahl testified that he thought that he had turned over additional records to the trustee in 1992, which records would have included tax returns for the partnerships. Counsel for the trustee testified and identified the records turned over to him by Opdahl and his counsel, and such records did not include any 1992 tax returns for the partnerships. Based on the evidence, the court concludes that the records have not been produced in compliance with the 1991 Order for Turnover.

Opdahl contends the trustee did not request the records. The trustee was not obligated to persistently write or call Opdahl's counsel to request compliance with the court's orders. The evidence indicated that efforts were made to demand compliance, but Opdahl chose not to comply with the orders. Even if the trustee had made no efforts to force compliance, Opdahl is still not excused from complying with the five orders entered October 24, 1991, July 9, 1992, September 16, 1993, December 10, 1993, and January 31, 1994 (not to mention the California order to deposit the funds in May, 1991). In addition, the trustee's complaint in the original turnover action and the various motions for contempt in the ongoing contempt proceedings constitute demands.

Opdahl challenged the amounts of attorney fees requested by Seyferth and the trustee, which raises an especially noteworthy incident. The court takes judicial notice that on January 12, 1991, Opdahl filed a response to Seyferth's second contempt motion, in which Opdahl revealed the "borrowing" and loss of the funds and then requested $51,000 for attorney fees for protecting the assets while serving as stakeholder. The audacity of this request is stunning since the fees are requested for the alleged protection of assets during the time Opdahl was misappropriating the funds and then concealing the misappropriation. It has been three years and eight months since Seyferth filed the action in California, and three years and six months since the trustee filed the turnover action. Both parties have incurred great expense, delay and frustration in trying to deal with Opdahl's refusal to perform his stakeholder's obligations. Opdahl's new assertion that he wants a set-off for a $51,000 legal bill for helping these claimants by protecting the funds—which are long gone—simply defies comment. This request was rejected by the court in January, 1994.

From the beginning of this protracted series of litigation in 1991, Opdahl has represented repeatedly in bankruptcy court and in California state court that he was a mere stakeholder, that he had possession of the funds, and that he would turn the funds over to the court or the party designated by the court. It is now apparent that this ongoing misrepresentation was a stall tactic to conceal the theft. Statements made after the misappropriation, feigning a willingness to turn over the funds or to tender them into court were intended to lull and stall the parties and the court. Such intentional statements were made as early as October 7, 1991 in the false affidavit submitted to the California court, and October 11, 1991 in Opdahl's deposition taken in the adversary action with the trustee three months after the funds were misappropriated. Opdahl testified falsely that he had the funds in an account and would tender them to the court. As recently as December 10, 1993, during a contempt hearing, Opdahl, through counsel Jean Maneke of the firm of current counsel, Krigel and Krigel, represented that he continued to hold the funds as a stakeholder. This statement to the court was not true. In the January 12, 1994 response pleading, Opdahl still maintained a stakeholder status, but then revealed he had "borrowed" the funds two and one half years earlier.

### III. LEGAL DISCUSSION

Opdahl makes two jurisdictional arguments. First, he argues the court does not have statutory authority to hold him in contempt. Second, he contends the contempt order by the court is not constitutional. Opdahl also contends the order with which he did not comply was not a lawful order. Alternatively, he contends he complied to the extent possible with the first order requiring him to turn over the funds and provide an accounting.

## A. JURISDICTION

### 1. Statutory Authority of Civil Contempt Order

■ Opdahl argues that no statutory authority exists that gives the court the power to find him in civil contempt. On the contrary, statutory authority for an order of civil contempt is found in 11 U.S.C. § 105(a), which provides:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

Therefore, the court finds that in a core proceeding it has statutory authority to hear and determine a request for civil contempt emanating from the violation of one of its orders. *See In re Skinner*, 917 F.2d 444, 447[4] (10th Cir.1990); *In re Walters*, 868 F.2d 665, 669–70[5] (4th Cir.1989); *In re Haddad*, 68 B.R. 944, 948–49[1] (Bankr. D.Mass.1987).

Two circuit court cases have found that bankruptcy courts have statutory authority to exercise civil contempt power. *Skinner*, 917 F.2d at 447, stated "Congress has granted [bankruptcy courts] civil contempt power by statute. This statutory authority derives from 11 U.S.C. § 105 and 28 U.S.C. § 157." *See also In re Walters*, 868 F.2d at 669. *Skinner* and *Walters* both reject *In re Sequoia Auto Brokers, Ltd.*, 827 F.2d 1281, 1289–90 (9th Cir.1987), which held that civil contempt power should not be implied from § 105(a). Following *Skinner* and *Walters*, this court finds that the language of § 105(a) is not ambiguous and that bankruptcy courts have statutory contempt power pursuant to § 105(a).

■ A bankruptcy court's civil contempt power is limited to core proceedings. 11 U.S.C. § 105(c); 28 U.S.C. § 157(a), (b)(1); *In re Skinner*, 917 F.2d at 447–48. "Civil contempt proceedings arising out of core

matters are themselves core matters." *Id.* (citations omitted). The original turnover order required Opdahl to turn the funds over to the trustee but reserved Seyferth's right to claim the funds. After the dispute between the trustee and Seyferth was resolved in Seyferth's favor, the directives were refined to permit Opdahl to turn over the funds directly to Seyferth. This is a core proceeding because the original order required him to "turn over property of the estate." 28 U.S.C. § 157(b)(2)(E). Additionally, the other orders requiring Opdahl to provide partnership records and an accounting dealt with a matter "concerning the administration of the estate." 28 U.S.C. § 157(b)(2)(A). Therefore, the court has jurisdiction over this matter and may enter final orders, including civil contempt orders, pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(2)(A), (E).

### 2. Constitutionality of Civil Contempt Order

■ Opdahl argues that the bankruptcy court does not have the power under the Constitution to find contempt. However, "[i]f Congress can constitutionally create legal presumptions, assign burdens of proof and prescribe legal remedies for Article I courts, it seems to follow that it can constitutionally grant [bankruptcy courts] the power to enforce their lawful orders through civil contempt." *In re Walters*, 868 F.2d 665, 670[6] (4th Cir.1989) (bankruptcy court civil contempt power does not offend the Constitution even under *Northern Pipeline* plurality view). "[T]he delegation of civil contempt power to the bankruptcy courts by 11 U.S.C. § 105(a) does not offend the Constitution as in violation of the separation of powers." *In re Skinner*, 917 F.2d 444, 450[6] (10th Cir. 1990) (quoting *In re Walters*, 868 F.2d at 670)).

The Eighth Circuit adopted the reasoning of *Walters* in *In re Ragar*, 3 F.3d 1174, 1180 (8th Cir.1993), where it found that a bankruptcy court has the constitutional authority to enter an order holding a defendant in criminal contempt, but with no immediate effect, pending review by the district court if the defendant objects. Because *Skinner* and *Walters* are persuasive on this point, this

court holds that its exercise of civil contempt power does not offend the Constitution.

### 3. Inherent Civil Contempt Power

■ In addition to statutory authority for civil contempt found in 11 U.S.C. § 105(a), there is persuasive authority that bankruptcy courts have contempt power to enforce their own orders and that "the power to punish for contempt is inherent in all courts." *In re Jim Nolker Chevrolet–Buick–Oldsmobile, Inc.,* 121 B.R. 20, 22 n. 5 (Bankr.W.D.Mo. 1990) (citing *Michaelson v. United States,* 266 U.S. 42, 65–66, 45 S.Ct. 18, 20, 69 L.Ed. 162 (1924) (the power to punish for contempt is inherent in all courts)); *see also Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *but see In re Skinner,* 917 F.2d 444, 447 (10th Cir.1990).

The Eighth Circuit in *In re Ragar,* 3 F.3d 1174, 1179 (8th Cir.1993), stated "[i]f a bankruptcy court can decide the qualification of attorneys to represent parties before it, which no one denies, and if such decisions are necessary or appropriate in the execution of the court's duties under Title 11, which again no one denies, it is likewise necessary or appropriate for the court to enforce its own orders." Other courts in this circuit have construed *Ragar* to give bankruptcy courts an inherent power. *See In re Calstar, Inc.,* 159 B.R. 247 (Bankr.D.Minn.1993) (discussing inherent power of court to punish violations of automatic stay, but not finding contempt). Therefore, the court finds that it has an inherent power to enforce its own orders through civil contempt. In the alternative, if it is determined that this order should be construed as a report and recommendation to the district court, a party must file objections within 10 days pursuant to Bankruptcy Rule 9033(b) in order to avoid the order becoming a final order.

### B. DUE PROCESS

■ Opdahl contends he was denied due process because he was not made a party to the second stage proceeding between the estate and Seyferth over the validity of Seyferth's claimed security interest in the funds. Opdahl was not denied due process and a hearing as a result of the hearing on July 15, 1993 regarding the trustee's objection to Seyferth's secured claim, which resulted in entry of the Memorandum Order and Opinion dated September 16, 1993.

Opdahl, who held himself out as a mere stakeholder, was not an interested party regarding the trustee's objection to Seyferth's secured claim. As stated in his affidavit submitted to the California court and in his deposition in the adversary action in bankruptcy court, Opdahl claimed he had no interest in or claim to the funds and was a mere stakeholder, so he would have had no position to argue at the hearing. As a disinterested stakeholder who was already bound by a previous, final turnover order providing for more general terms for turnover to the estate, Opdahl could have no interest in whether, thereafter, the estate or Seyferth had a superior claim to the funds. Opdahl's only interest would have been to make further misrepresentations to conceal the misappropriation and delay the day of reckoning.

### C. PARTIES TO CONTEMPT PROCEEDING

Opdahl argued that this court lacks jurisdiction to hear this matter because it is merely an attempt by a secured creditor to collect its debt. The argument is without merit because as a stakeholder, Opdahl has no interest in the proceedings other than to turn over the funds to the designated party. Regardless of Seyferth's status as a secured creditor of the estate, Opdahl has refused to comply with numerous turnover orders which are final.

The trustee was permitted to intervene in this particular proceeding by an order dated January 31, 1994. Both the trustee on behalf of the estate and Seyferth are real parties in interest who may seek a contempt order against Opdahl because both claimed the right to funds misappropriated during the time Opdahl represented he was holding the funds as a mere stakeholder. In addition to the funds, the 1991 turnover order and subsequent orders directed turnover of partnership books and records and submission of an accounting to the trustee.

Even if the order entered September 16, 1993 determined that Seyferth had a superior claim to the funds, the trustee still had rights under the 1991 order for turnover which required Opdahl to turn over both records and assets. If the trustee is denied the right to demand compliance with the 1991 order for turnover after the September, 1993 order pertaining to a dispute between the estate and Seyferth on his secured claim, then this court would be unable to enforce its orders. If Opdahl preferred to comply with the 1991 order instead of the 1993 order, he could have turned over the funds to the trustee who would in turn have delivered them to the secured claimant, Seyferth.

## D. REQUIREMENTS FOR CONTEMPT

### 1. Knowledge of Specific Court Order

■ "In order for a party to be cited for civil contempt, a court must find that the party violated a specific and definite court order and that the party had knowledge of the order sufficient to put him on notice of the proscribed conducted [sic]." *In re Skinner*, 90 B.R. 470, 479[7] (D.Utah 1988) *aff'd*, 917 F.2d 444 (10th Cir.1990) (citing *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 51 (2d Cir.1976), *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977)). The conditions have been met in this case.

Five orders have been entered from October 24, 1991 through January 31, 1993 for Opdahl to turn over property and provide an accounting. Opdahl has failed to comply with any of them, so Opdahl has violated specific orders requiring him to turn over the funds from Babbidge which he said he held as a stakeholder.

The court entered a specific order on October 24, 1991 for Opdahl to turn over both partnership books and records and the funds he represented he was holding. Opdahl's motion to reconsider that order was denied on July 9, 1992. The order of September 16, 1993, determined that Seyferth's claim to the funds was superior to the trustee's claim and that Opdahl could turn the funds over to Seyferth instead of to the trustee. Opdahl received a copy of the order, but he was not a party with standing to contest the proceeding or the September 16, 1993 order. His obligations, previously determined in prior orders, were not substantively altered. The same result would be reached if the funds were turned over to the trustee pursuant to the 1991 and 1992 orders and the trustee then turned over the funds to Seyferth pursuant to the September, 1993 order. The court entered additional turnover and accounting orders on December 10, 1993, and January 31, 1994.

Opdahl apparently contends that he did not have knowledge of the orders of this court. The court finds that Opdahl had knowledge of the orders. Opdahl testified that he knew the trustee had demanded the partnerships' records, and Opdahl thought he had turned over the records in 1992. This testimony is an indicator that Opdahl knew of the entry of an order to turn over records. Opdahl was aware of the adversary action and the hearing in October, 1991 because on October 11, 1991 he was deposed in that action (and that testimony was used at the hearing). As to the September 16, 1993 order deciding the dispute between Seyferth and estate, in addition to copies served by the court, it is the court's understanding that Opdahl or his counsel were sent a separate copy by Seyferth's counsel.

Opdahl was aware of each order either directly or through his agent lawyers, and he had counsel representing him and making arguments on these issues throughout these proceedings starting in 1991. During all the proceedings in question Opdahl was and still is represented by the firm of Krigel and Krigel in Kansas City, Missouri and by William Cavanaugh of Newport Beach, California. There has been no suggestion that Krigel and Krigel or Cavanaugh failed to inform the client of such orders.

From pleadings filed over the years, including the various pleadings in which Opdahl's status as a mere stakeholder was repeated, the motion to reconsider the original turnover and consolidation order in 1991, and the appeal from the consolidation portion of the order, the court concludes that Opdahl had to know of the orders. To conclude otherwise would require the court to find

that Krigel and Krigel filed such pleadings without authorization from the client, and without making a reasonable inquiry to ascertain that statements in the pleadings were well-grounded in fact pursuant to FRCP 11 and Bankruptcy Rule 9011. To conclude otherwise would also require the court to conclude that court appearances were made without conferring with the client and that statements made in open court, such as the statement in court on December 10, 1993, by counsel Jean Maneke of the Krigel firm, that Opdahl still possessed the funds as a stakeholder, were made without conferring with the client or making a reasonable inquiry. Moreover, there certainly has been no evidence to suggest that the appeal of one part of the two-part order consolidation and turnover order of October 24, 1991 was done without the client's consent or his knowledge of the order. In any event, communication of the orders to these lawyers as Opdahl's attorneys and agents is binding on Opdahl as to knowledge of the orders.

As to attorney Cavanaugh, it stretches the limits of credibility to think that Opdahl would request $51,000 for attorney fees for services as a stakeholder but that Opdahl would not be aware of this court's orders entered over a period of two and one-half years. The bulk of the $51,000 in attorney fees for which Opdahl sought payment in January, 1994 related to fees billed by William Cavanaugh for services supposedly rendered to Opdahl in his capacity as a stakeholder and in protecting the funds he held. In order to generate fees of $51,000 for stakeholder work, Cavanaugh must have performed substantial services and conferred with Opdahl in regard to the bankruptcy proceedings and the orders.

In fact, the requested set-off for attorney fees could be construed as an indicator of Opdahl's knowledge of the orders and his state of mind to avoid compliance with them. The timing of the request indicates that Opdahl was using the fee request to continue stalling the inevitable, to reduce by a substantial set-off his liability under the turnover orders, and to soften the impact of the just-revealed misappropriation by minimizing the amount characterized as misappropriated.

### 2. Lawful Order of the Court

For civil contempt to be an appropriate sanction, Opdahl must have violated a lawful order of the court. *In re Walters,* 868 F.2d 665, 670 (4th Cir.1989). Opdahl argues that the subsequent turnover orders were not lawful because they were not issued in an adversary proceeding where he was named as a defendant and he did not have notice of the hearing. Opdahl, citing *In re Monson,* 87 B.R. 577, 580 n. 5 (Bankr.W.D.Mo.1988), argues that because a secured creditor was required to take more steps than merely filing a proof of claim in order to recover an asset held by the trustee, conversely, Seyferth or the trustee in this case was required to file an adversary action against Opdahl. However, *Monson* merely stands for the proposition that one must do more than file a proof of claim in order to protect one's interest in property claimed by the estate. This argument is a red herring, but it will be addressed in an effort to address all the issues presented.

The allegation that an adversary action must be filed to seek turnover is without merit. The turnover order of October 24, 1991 was issued in an adversary action filed by the trustee in which Opdahl was duly served and appeared. *See Thomas Carlson, Trustee, Plaintiff v. Gary Opdahl, Defendant,* Adversary No. 91–6031–S–7 (Bankr. W.D.Mo.1991). The orders in that proceeding are final and no issues were raised in that proceeding as to lawfulness of the orders. By an order entered January 31, 1994, the trustee, who filed the 1991 turnover action, was permitted to intervene in support of Seyferth's Second Amended Motion for Contempt and the March 7, 1994 hearing on contempt.

It was not necessary for Seyferth or the trustee to commence a second adversary action to force Opdahl to comply with the first turnover order entered in an adversary action. Opdahl was not an interested party in hearings regarding the ultimate disposition of the funds once his stakeholder status was determined and the turnover order was en-

720

tered in the 1991 adversary action between Opdahl and the trustee. As Opdahl represented to the California court in his affidavit and to the bankruptcy court in his deposition for trial in October, 1991, he claimed no interest in the funds. A mere stakeholder, as Opdahl characterized himself, would have no reason to present a defense or take a position. After the turnover order was entered, Opdahl should have complied despite the fact that he was not named as a defendant or respondent in the subsequent litigation between the trustee and Seyferth. Opdahl's argument is specious because he could still comply with the 1991 and 1992 turnover orders by turning over the funds to the trustee, who would then be obligated to turn the funds over to Seyferth. In essence, the turnover directive in the September, 1993 order merely repeated and refined the directives in the final orders entered in 1991 and 1992.

In contrast to the secured creditor in *Monson*, Seyferth attempted to protect his interest in the funds. In February 1991, after Opdahl's first refusal to turn over the funds he held as a stakeholder, Seyferth filed an action in California to obtain the funds from Opdahl. Seyferth also intervened in the 1991 action between the trustee and Opdahl in order to protect his claim. Finally, *Monson* is not factually on point. *Monson* did not involve a third party that had willfully disobeyed a court order to turn over funds in his possession.

### E. COMPLIANCE WITH ORDERS
■ Opdahl argues alternatively that he has complied with the orders as far as is possible and, therefore, should not be held in contempt. Opdahl correctly states that civil contempt is appropriate "only when it appears that obedience is within the power of the party being coerced by the order." *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir.1986) *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987) (quoting *Maggio v. Zeitz*, 333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476 (1948)).

#### 1. Accounting and Partnership Records
■ Although numerous orders have been entered ordering Opdahl to turn over

the stakeheld funds and books and records, Opdahl argues that the trustee never requested that he turn over any records. The trustee believes he made demands but whether the trustee made a demand to him directly is irrelevant in light of the many court orders requiring Opdahl to turn over the funds and partnership records and to provide an accounting. In addition, filing of the turnover complaint in 1991 and the numerous motions in the ongoing contempt proceedings constitute demands.

Second, Opdahl claims that he has complied with the court's order for an accounting because he supplied the books and records of the partnership and an accounting as requested. It is not an adequate production to produce for the first time a box of miscellaneous records in open court on March 7, 1994, at which time Opdahl apparently expected the trustee to review the records in the midst of the hearing. That meager and belated production of a few records in open court may alleviate his failure to comply with the orders. However, contrary to Opdahl's assertion, the production is not sufficient to purge him of contempt so as to require denial of the requests for attorney fees.

As to the accounting, the court has found that the response filed on January 21, 1994 was not sufficient. It consisted only of copies of intermittent bank statements with payments listed to unspecified entities and absent the corresponding checks. The bank statements show deposits and withdrawals for substantial amounts that are not documented. Opdahl's affidavit stated that he transferred $140,000 from the partnership account to himself to help him purchase a house. However, the settlement statement for purchase of the house states the net amount due from Opdahl was $119,950. The accounting does not explain what happened to the remainder of the funds Opdahl transferred to himself.

Opdahl's efforts to comply with the records and accounting provisions of the turnover orders were deficient. The court finds that Opdahl has not complied with its orders and has not given satisfactory reasons for failure to comply which would be sufficient to avoid

a finding of contempt. Although the turnover of records and the accounting are not sufficient to be considered in compliance with the turnover orders, for practical purposes it may be futile to demand further compliance with that portion of the orders due to Opdahl's invocation of the Fifth Amendment privilege against self-incrimination at the hearing on March 7, 1994. Thus, the primary focus of this order will be turnover of the funds and compensation for the damages incurred by the estate and Seyferth from the concealment and delay.

## 2. Funds

 Opdahl asserts he cannot comply with the order to turnover funds because he no longer has in his possession the money he was supposed to be holding as a stakeholder and that he was ordered to turn over to the trustee or Seyferth. As Opdahl revealed in the pleading filed January 12, 1994, on July 14, 1991, during the adversary proceeding for turnover of the funds and before the October, 1991 turnover order, Opdahl "borrowed" the money to buy a house and did not disclose the fact. He not only did not disclose it, he actively concealed it. At the March 7, 1994 hearing, when questioned about the source of funds for his purchase of a $425,000 house, Opdahl invoked his Fifth Amendment privilege and refused to testify. Invocation of the Fifth Amendment permits the court to draw an inference that the answer to the question would have been adverse to Opdahl. *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *In re Bailey*, 145 B.R. 919, 927[10] (Bankr. N.D.Ill.1992). The court finds that Opdahl bought a house with the money he was ordered to turn over to the estate and later to Seyferth.

Under Opdahl's rationalization, that he should not be liable for turnover of the funds because he invested them in a house, a person who steals money and keeps it would suffer contempt of court, but a clever thief could with impunity steal the money and invest it or buy a house so the cash was no longer readily available in cash form. This is not a situation where Opdahl cannot comply for reasons beyond his control. Opdahl can-

not plead inability to repay the misappropriated funds due to his own dishonest actions.

Opdahl also contends he cannot pay because in 1993 he had income of only $10,000. That testimony is not credible in light of the fact that in 1993 he was able to pay personal property taxes and substantial sewer assessments on his new home. He also overlooks the fact that he has other assets, including a house costing $200,000, and a 1991 Mercedes Benz and other late model vehicles. Opdahl contends he no longer has the funds, but he has simply converted the funds to other property.

## F. NATURE OF CONTEMPT AND DAMAGES

 Before entering a contempt order the court must determine whether the contempt should be classified as civil or criminal. The primary purposes of a sanction for civil contempt are to compensate the complaining party for losses sustained by one's disobedience of a court order or to coerce the defendant into complying with the court order. *Hubbard v. Fleet Mortgage Co.*, 810 F.2d 778, 781 (8th Cir.1987) (citing *United States v. United Mine Workers*, 330 U.S. 258, 302–04, 67 S.Ct. 677, 700–02, 91 L.Ed. 884 (1947)). The primary purpose of a sanction for criminal contempt is to punish the offender and vindicate the authority of the court. *Id.* at 781–82 (same).

 The court will decline the request to hold Opdahl in criminal contempt, although that sanction appears appropriate in light of the fact that over a period of years Opdahl has caused false statements to be made at hearings and in pleadings, perpetrating a fraud on the court to conceal his theft of funds in which both the estate and creditor Seyferth claimed an interest. It appears that a more effective order, in order to address the injuries caused by Opdahl's contemptuous acts, is an order of civil contempt. The contempt here is civil in nature because the sanction is designed to compensate the estate and Seyferth for losses sustained by Opdahl's refusal to comply with turnover orders and his misappropriation of the money he held as a stakeholder. Therefore, argu-

ments regarding criminal contempt are not addressed.

The court may award damages equal to the amount of actual loss sustained by the injured party. *See United States v. United Mine Workers,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 701–02, 91 L.Ed. 884 (1947). The damages may also include attorney fees and costs. *Perry v. O'Donnell,* 759 F.2d 702, 705 (9th Cir.1985). Opdahl is ordered to pay immediately to either Seyferth or the trustee $134,235.25 plus interest at 10% from the date he first received the funds from the Crocker note to correct Opdahl's refusal to comply with the turnover orders entered from October, 1991 through the present. The 10% interest rate is the same as in the original settlement among the parties in California, out of which the disputes in this court arise. If Opdahl pays the funds to the estate, the trustee is ordered to turn them over to Seyferth pursuant to the order entered September 16, 1993.

Opdahl asserts the trustee should not be awarded attorney fees for defending Opdahl's appeal of the October 24, 1991 order for consolidation of the partnerships into the Babbidge estate. However, the court finds that Opdahl's appeal was an attempt to stall the trustee in his pursuit of the funds. If Opdahl had disclosed the misappropriation in July, 1991 before the trial, instead of concealing it´ for several years, the trustee might have had less or no legal expenses on the consolidation and turnover proceeding, the motion to reconsider, the appeal from the consolidation order, and the litigation with Seyferth over rights to the funds.

Opdahl is ordered to pay Seyferth $15,-885.50 and the trustee $18,012.40 for attorney fees and expenses incurred in efforts in this bankruptcy case to obtain possession of· the funds from Opdahl. The trustee's attorney fees include fees to defend the consolidation appeal, which was a stalling tactic, and for proceedings to determine the party with the superior interest in the funds, as noted above. The court, which can review the fees as its own expert, has observed the work performed by attorneys for the trustee and Seyferth and finds that the fees and expenses costs are adequately described, and that the services provided and the fees and expenses are reasonable.

## IV. CONCLUSION

The court has jurisdiction over this matter and authority to hold Opdahl in civil contempt. Opdahl had knowledge of the specific, lawful court orders requiring him to turn over funds to either the trustee or Seyferth. Opdahl has not complied with the turnover order first entered in October, 1991 or any of the four subsequent orders addressing the issue and, therefore, he must compensate the trustee on behalf of the estate and Seyferth for the misappropriated funds and for their legal expenses.

Accordingly it is **ORDERED, ADJUDGED AND DECREED** as follows:

1. Timothy Seyferth's Amended Second Motion for Contempt is granted and Gary Opdahl shall be in contempt of the orders of this court until he complies with this order and judgment.

2. Opdahl shall pay either the trustee or Timothy Seyferth $134,235.25 plus interest at 10% per annum from October· 17, 1991, as ordered in previous turnover orders. If the funds are paid to the estate, the trustee shall deliver them to Seyferth pursuant to the order entered September 16, 1993.

3. Opdahl shall pay Timothy Seyferth $15,885.50, plus interest at the federal rate from March 7, 1994, for his attorney fees and expenses.

4. Opdahl shall pay the trustee on behalf of the estate $18,012.40, plus interest at the federal rate from March 7, 1994, for attorney fees and expenses.

5. In the event this order is construed as a report and recommendation under 28 U.S.C. § 157(c)(1), then it shall become final unless a party files objections within 10 days pursuant to Bankruptcy Rule 9033(b).